# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**-vs-**                                                    **Case No.  6:07-cr-52-Orl-19JGG**

**DERICK MASON**

_____

# ORDER

This case comes before the Court on Defendant's Unopposed Motion for Order (Doc. No. 68).  The Court held an evidentiary hearing on December 20, 2007, to determine whether Defendant Derick Mason is competent to stand trial.

## Background and Procedural History

Defendant was convicted of a sex offense in New York state court and is now charged in federal court with failing to register as a sex offender after moving to Florida as required by 18 U.S.C. section 2250.  (Doc. No. 23).  Pursuant to Defendant's unopposed motion, Defendant previously underwent a competency examination in this case and was found by Dr. Jeffrey Danziger to be competent to proceed to trial.  (Doc. No. 38, Def. Ex. 5[1]).  Events that occurred at Defendant's change of plea hearing on July 24, 2007, caused the parties to revisit the issue of Defendant's competency and sanity.  (Doc. Nos. 59, 62).  Upon Defendant's request, the Court ordered that

---

[1]       At the competency hearing Defendant provided the Court with a bound composite exhibit which was admitted into evidence without opposition.  (*See* Doc. No. 74).  Unless otherwise indicated, all citations to the record from the hearing refer to this composite exhibit.  Defendant's composite exhibit will be cited as "Def. Ex."  Each exhibit within the composite exhibit will be cited according to Defendant's numerical tabs, and all pages will be cited according to their Bates numbers.

Defendant undergo a mental health examination to determine his competency at the time of the offense[2] and competency to stand trial.  (Doc. Nos. 60, 64).  After receiving a report from the Bureau of Prisons which found that Defendant was competent to stand trial, Defendant filed an unopposed motion requesting a hearing to assess his competency.  (Def. Ex. 7; Doc. No. 68).

On December 20, 2007, the Court held a competency hearing.  (Doc. No. 73).  At the hearing the Court heard testimony from the Government's expert witness, Dr. Lisa Feldman, a forensic psychologist with the Federal Bureau of Prisons, and Defendant's expert witness, Dr. Jacqueline Olander, a licensed psychologist with Psychological Affiliates, Inc.   Both experts were highly qualified and rendered well-researched, thorough opinions that differed in multiple important respects.[3]   Based on the evidence presented, the Court makes the following findings of fact and conclusions of law.

## **Standard of Review**

Title 18 U.S.C. section 4241(a) allows a defendant to request a hearing to determine his own mental competency at any time between when the action has commenced and sentencing.  If a defendant's competency is reasonably in dispute, the Court should hold a hearing to determine whether "a preponderance of the evidence [demonstrates] that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable

---

[2]        The defense raised the issue of Defendant's competence at the time of the offense in  its unopposed request for a competency report. (Doc. No. 60).  Although the parties alluded to the issue in their opening statements, they presented very little evidence on the issue and argued that it was not contested.  The testimony of both experts supports finding Defendant competent at the time of the offense.

[3]        Counsel for Defendant also advised the Court his dealings with his client convinced him that Defendant was not competent to stand trial.

to understand the nature and consequences of the proceedings against him or to assist properly in his defense."[4] 18 U.S.C. § 4241(a)-(d).  The Government bears the burden of proving the Defendant competent by a preponderance of the evidence.  *United States v. Markis*, 535 F.2d 899, 906 (5th Cir. 1976), *cert. denied*, 430 U.S. 954 (1977).[5]  The presence of a mental disorder, a low level of intelligence, erratic behavior, or the fact that a defendant has been treated with anti-psychotic drugs does not necessarily render a defendant incompetent.  *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995), *cert. denied*, 517 U.S. 1247 (1996).  In assessing a defendant's competency, a court must consider "a defendant's past medical history, the opinion of psychiatric experts, and the defendant's behavior during trial."  *Woodall v. Foti*, 648 F.2d 268, 273 (5th Cir. Unit A June 1981).

## Analysis

### I.      Defendant's Medical History

Over the course of his lifetime, Defendant has had a significant number of psychiatric evaluations which yielded contradictory or inconclusive results.   On at least two occasions Defendant was classified as borderline retarded.  (Def. Ex.  9, p. 99 (classifying Defendant as "borderline retarded in terms of his competencies"); Def. Ex. 17, p. 212 (classifying Defendant as having "Estimated mild mental retardation")).  However, other doctors classified Defendant as "not retarded" or indicated that there was a need for Defendant to undergo further testing to rule out retardation.  (*E.g.,* Def. Ex. 10, p. 113 (classifying Defendant as "not retarded"); Def. Ex. 14, p. 140

---

[4]      A defendant's competency to plead guilty is tested under the same standard as a defendant's competency to stand trial.  *Godinez v. Moran*, 509 U.S. 389, 397-98 (1993).

[5]      In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted the decisions of the United States Court of Appeals for the Fifth Circuit that were handed down prior to October 1, 1981 as binding precedent.

("Rule out intellectually deficient or mental retardation"); Def. Ex. 14, pp. 151-52 (intelligence test scores indicated mild mental retardation, but doctor opined that intellectual functioning was more likely within the borderline range and recommended additional testing to rule out "Borderline intellectual functioning")).   Additionally, some of the reports state that it is highly likely that Defendant's intelligence test results were affected by his psychiatric impairments or history of substance abuse.  (*E.g.,* Def. Ex. 14, p. 150-51 (results affected by "psychiatric disturbance"); Def. Ex. 16, p. 198 (diagnosis of psychiatric impairments might have been affected by history of substance abuse)).   Over the course of his life, Defendant has been diagnosed as suffering from depression, schizophrenia, and generalized anxiety disorder.  (*E.g.,* Def. Ex. 14, p. 139 (clinically depressed); Def. Ex. 14, p. 152 (schizophrenia); Def. Ex. 16, p. 198 (generalized anxiety disorder)).  With respect to his psychotic disorder, there is evidence that Defendant's schizophrenia can be controlled with medication. (Def. Ex. 5, p. 33).

On May 3, 2007, pursuant to Defendant's unopposed request, Defendant underwent a competency examination by a Dr. Jeffrey Danziger in connection with the instant case.  (Def. Ex. 5).  Dr. Danziger found that Defendant had borderline intellectual function but was still competent to proceed.  (Def. Ex. 5, p. 33).  Dr. Danziger found that Defendant: (1) had a basic understanding of the nature of the proceedings and the court process; (2) understood the role of his attorney and seemed capable of relating to his attorney and communicating facts relevant to his defense; and (3) although Defendant had a history of schizophrenia, Defendant's conditions had improved with medication so that he could behave appropriately in the courtroom.  (*Id.*)

II.     **Expert Testimony**

A.      **Government's Evidence**

At the evidentiary hearing before the Court, the Government presented testimony from Dr. Lisa Feldman.  Dr. Feldman testified that she examined Defendant's medical history and conducted a twelve hour examination of Defendant in September and October of 2007.  She examined Defendant for signs of retardation, mental illness, and malingering.  She ultimately concluded that Defendant was competent at the time of the offense and competent to stand trial.  (Def. Ex. 7).

With respect to Defendant's past medical history, Dr. Feldman opined that the contradictory results could have been caused by Defendant's malingering.  Dr. Feldman referenced some of Defendant's previous test results and testified that they indicated that Defendant was not always completely candid with his doctors.  (*E.g.*, Def. Ex. 9, p. 98 (evaluation from school in Georgia stated that some of Defendant's problems might have resulted from his desire to "engineer a return to his father" in New York); Def. Ex. 14, p. 138 (Defendant told the psychologist that he "can't read a lick," but Dr. Feldman's testing revealed that Defendant could read because he completed a test that required him to read at a 7th or 8th grade reading level and his results were reliable); Def. Ex. 7, pp. 58-59 (Defendant gave inconsistent information about history of substance abuse)).

Dr. Feldman noted that Defendant often became frustrated during the evaluative process, but he "exhibited organized, rational, sequential and coherent thought processes."  (Def. Ex. 7, pp. 60-61).  Defendant was able to express himself and function independently.  (*Id.*)  When Defendant became frustrated, he stated things like "I give up.  I'm not a project."  (*Id.* at p. 61).  When Defendant got questions correct, he made comments like "Pills sure helping."  (*Id.* at pp. 60-61).

Dr. Feldman gave the Kaufman Adolescent & Adult Intelligence Test (KAIT) to assess Defendant's intelligence.  (*Id.* at p. 62).  Defendant received significantly higher Crystalized IQ scores, which assess tasks related to formal schooling and previous experiences, than Fluid IQ scores, which assess a subject's ability to deal with novel problems.  (*Id.*)  Dr. Feldman concluded that Defendant had a Composite Score of 77, corresponding to "Borderline Intellectual Functioning."  (*Id.*)  Although Defendant's Fluid IQ score was within a deficient level, Dr. Feldman testified that Defendant's overall results did not indicate mental retardation because he exhibited enough adaptive skills to function in his daily life.

Dr. Feldman concluded that Defendant was exaggerating his impairment and opined that his intellectual and cognitive functioning were higher than his test results indicated.  (*Id.* at p. 63).  Dr. Feldman gave Defendant the Booklet Category Test-Second Edition (BCT), Test of Memory Malingering (TOMM) and Validity Indicator Profile (VIP) to assess whether his impairments were a result of malingering.  Defendant's results in the BCT, a test designed to assess neuropsychological impairments consistent with brain injuries, indicated exaggeration or fabrication of an impairment because he failed to answer questions which people with proven brain injuries could answer correctly.  (*Id.* at p. 62).  Additionally, Defendant's results on the TOMM indicated that he was fabricating his memory impairments because he was unable to retain information that was easily retained by people with genuine impairments.  (*Id.*)  Defendant's responses on the VIP indicated that he was probably putting forth insufficient effort.  (*Id.* at p. 63).

Dr. Feldman also administered a series of personality tests to Defendant.  (*Id.* at p. 63).  She gave Defendant the  Minnesota Multiphasic  Personality Inventory-Second Edition (MMPI-2) to assess his personality and psychiatric characteristics via audiotape.  (*Id.*)  Dr. Feldman found that

Defendant's results were invalid for clinical interpretation because his responses indicated an exaggerated endorsement of psychiatric symptoms and combinations that are rarely found in individuals with genuine psychiatric impairments.  (*Id.*)  Defendant's results on the Structured Interview of Reported Symptoms (SIRS) test also indicated that he was malingering because he exhibited a combination of elevated scores which was more characteristic of individuals who feign mental disorders than those who respond truthfully.  (*Id.*)  Finally, Dr. Feldman gave Defendant the Multiphasic Sex Inventory II (MSI-II) to assess multiple psychosexual characteristics.  (*Id.*)  The results indicated that Defendant was obsessed with sex and a had history of aggressive sexual behavior. (*Id.*) Overall, Dr. Feldman's opinion was that Defendant demonstrated organized thinking and realistic perceptions but had a history of irresponsible, dangerous behavior and substance abuse. (*Id.* at p. 64).

Dr. Feldman's formal assessment was that Defendant was competent at the time of the offense, is competent to stand trial, and is malingering his psychiatric and cognitive impairments in an effort to avoid punishment or receive a reduced sentence.   (*Id.* at pp. 66-68).  Dr. Feldman observed no deficit in Defendant's adaptive functioning and classified him as having "Borderline Intellectual Functioning," not mental retardation.  (*Id.* at pp. 65-66).  Dr. Feldman intimated that Defendant was capable of understanding the charges against him and assisting in his defense.  (*Id.* at pp. 66-67).  Defendant understood that he was charged with failure to register as a sex offender, correctly identified his attorney, demonstrated some understanding of courtroom proceedings, and was aware of the penalties associated with being found guilty.  (*Id.*)  Additionally, Defendant's behavior was purposeful and under his volitional control.  (*Id.* at p. 67).

Dr. Feldman testified that she also gave Defendant the Georgia Court Competency Test-Mississippi State Hospital (GCCT-MSH) to assess his competence with respect to the instant court proceeding. (*Id.* at pp. 66-67). Dr. Feldman stated that the results were consistent with her opinion that Defendant is competent to stand trial and is malingering his incompetence. (*Id.*)

### B.     Defendant's Evidence

The defense presented testimony from Dr. Jacquelyn Olander. Dr. Olander testified that she evaluated Defendant for four hours over two days in June and July of 2007. (Def. Ex. 6, p. 36). At the time of her evaluation, Dr. Olander's behavioral observations of Defendant were as follows. She reported that Defendant's speech was disorganized and "revealed significant limitations in his cognitive, expressive and receptive language functioning." (Def. Ex. 6, p. 37). Although Defendant was capable of following simple commands, he was unable to carry on a multi-topic discussion or demonstrate the sustained attention required to carry out a two-phased request. (*Id.*) She noted that Defendant was often distracted, easily frustrated, and behaved inappropriately. (*Id.*) Dr. Olander opined that her observations of Defendant were consistent with his previous diagnoses of mental retardation. (*Id.*) Dr. Olander reported that her interview of the Defendant indicated he understood the nature of the charges against him and the potential penalty, but did not understand the adversarial process and was not equipped to rationally and reasonably consult with his lawyer. (*Id.* at pp. 43-44). According to Dr. Olander, Defendant was unable to grasp the concept of plea bargaining, convey relevant information accurately, and draw reasonable conclusions based on the facts presented. (*See id.* at p. 44).

At the hearing, Dr. Olander's testimony also focused primarily on discrediting Dr. Feldman's results. She testified that many of the tests Dr. Feldman used were likely to yield inaccurate or

unreliable results because of Defendant's mental retardation and psychotic disorders.  For instance, Dr. Olander testified that the KAIT used by Dr. Feldman was a second generation intelligence test. She claimed that the Wechsler Adult Intelligence Scale-III (WAIS-III) that she administered was a third or fourth generation intelligence test that was more likely to yield accurate results.  The WAIS-III results indicated that Defendant was mild to moderately retarded and had difficulty understanding verbally presented information. (*Id.* at p. 40).  Additionally, Dr. Olander noted that her administration of the Woodcock-Johnson III Tests of Achievement (WJTA) indicated that Defendant did not have functional reading skills.  (*Id.* at pp. 41-42).  Dr. Olander testified that Defendant was severely deficient in terms of adaptive functioning, such that he was incapable of living alone.[6]

Dr. Olander also testified that her examination did not indicate that Defendant was malingering and opined that Dr. Feldman's tests were likely inaccurate.  Dr. Olander administered the Miller Forensic Assessment of Symptoms Test (M-FAST) to determine if Defendant was malingering.  (*Id.* at p. 40).  Dr. Olander's report indicates that Defendant produced valid results. (*Id.*)  However, she testified that she changed the interpretation of the raw data but failed to mention it in her report.  According to Dr. Olander, Defendant's score indicated malingering, but she changed her interpretation, contrary to the instructions on the manual for this test, in order to account for Defendant's sub-average intelligence.[7]

---

[6]      However, the record reflects that Defendant was able to live alone and care for himself during the time he was living in Florida.  (*E.g.,* Doc. No. 9, Def. Ex. 8, pp. 84-87).

[7]      Dr. Feldman testified that the raw data from Dr. Olander's M-FAST test was highly suggestive of malingering.

In June 2007, Dr. Olander concluded that Defendant was mentally retarded, suffered from a psychotic disorder, and was not competent to stand trial.  (Def. Ex. 6). Dr. Olander testified that the testing she performed was accurate in June 2007.  However, Dr. Olander failed to testify as to Defendant's current state and claimed that she would have to retest him to assess his current competency to stand trial.  Thus, she refused to express an opinion on Defendant's competency as of the date of the hearing.  Additionally, when asked on cross-examination whether she thought Defendant was competent to plead guilty on July 24, 2007, she would not state her opinion.  After repeated questions as to this hearing, she deferred to defense counsel and said that the Court should assume his recollection of the events was correct.[8]  Although Dr. Olander would not opine on Defendant's competence to stand trial, she testified that Defendant was competent at the time of the offense.

## III.    Defendant's Conduct During his Court Proceedings

In Defendant's change of plea hearing, he discussed his living arrangements, stated that he had found a job and informed the Magistrate Judge that he was involved in a romantic relationship.  (Def. Ex. 8, pp. 74-75, 84-85).  Defendant told the Magistrate Judge that he wanted to move to Florida because it was easier to find a job and indicated that he knew he had to fill out paperwork once he relocated.  (*Id.* at pp. 80, 81).  Therefore, Defendant's own statements indicate that he

---

[8]    In the transcript from the plea hearing, defense counsel stated that "Dr. Olander has expressed to me that despite some of his limitations that he is competent to at least proceed in this proceeding."  (Def. Ex. 8, p. 72).

understood the offense with which he was charged and was able to function independently in his daily life.[9]

Defendant's competency hearing lasted approximately four and one-half hours during which the Court had ample time and opportunity to observe Defendant's behavior. Defendant appeared intently focused during the proceeding. He made eye contact with the witnesses and listened to the testimony. He nodded his head in agreement with certain statements made. Defendant was also focused on the attorneys as they made their presentations to the Court and communicated with his counsel during breaks in the testimony. Thus, the Court's observations of Defendant during the competency hearing support the expert testimony finding Defendant competent to stand trial.

## IV.     Summary of the Evidence

After considering the evidence presented, the Court finds that Defendant was competent at the time of the offense. With respect to Defendant's competence to stand trial, the Court finds that Dr. Feldman's findings are more worthy of credence than the conclusions of Dr. Olander.

First, Dr. Feldman's findings comport with the findings of Dr. Danziger, the independent expert appointed by the Court on request of Defendant. Second, Dr. Feldman was able to offer a diagnosis of malingering as an explanation of the discrepancies within Defendant's test results. Next, Dr. Feldman's testimony was consistent with her report and contained no evidence of manipulation. In contrast, Dr. Olander manipulated the interpretation of her test designed to assess malingering and failed to disclose it in her report. Additionally, Dr. Feldman's findings address

---

[9]     Neither party objected to the admission of the transcript from Defendant's plea hearing. "[A]bsent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *United States v. Mezzanatto*, 513 U.S. 196, 210 (1995).

Defendant's current level of competency, and Dr. Olander's do not. Dr. Olander refused to testify with respect to Defendant's current competency or his competency at the time of his plea hearing. Also, Dr. Olander deferred to defense counsel's recollection of the plea hearing at which he stated on the record that Dr. Olander advised him that Defendant was competent to proceed with respect to that hearing. Finally, Dr. Feldman's conclusion that Defendant is competent to stand trial is consistent with the Court's own observations of the Defendant during the competency hearing.

### Conclusion

Based on the foregoing, the Court finds Defendant Derick Mason was competent at the time of the offense and is competent to stand trial.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on January 6, 2008.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
Derick Mason